IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

GLENN T. TURNER,

                Plaintiff,

v.

GARY BOUGHTON, LEBBEUS BROWN,
MARK KARTMAN, KEVIN KALLAS,
MICHAEL ROTH, STEPHEN SCHNEIDER,
MATTHEW MUTIVA, and ANGELA MINK,

                Defendants.[1]

OPINION and ORDER

19-cv-1001-jdp

---

Plaintiff Glenn T. Turner, appearing pro se, is a prisoner at Wisconsin Secure Program Facility. Turner contends that defendant prison officials failed to treat his mental health problems in various ways. He alleges that Psychological Services Unit staffing shortages caused severe delays in his treatment, that correctional officers refused to intervene when he told them that he had thoughts of self-harm, and that a psychological unit staff member failed to follow up with him for months on his reports of depression and anxiety. He brings claims under the Eighth Amendment to the United States Constitution and Wisconsin negligence law.

Currently before the court are Turner's motion to compel discovery, motions for sanctions regarding discovery issues, and motion for summary judgment. I will deny his motions to compel and for sanctions. And because I conclude that Turner fails to show that he is entitled to judgment as a matter of law, I will deny his summary judgment motion.

---

[1] I have amended the caption to reflect the proper spelling of defendant Schneider's name as reflected in defendants' submissions.

Defendants have also filed a motion for summary judgment that is not yet fully briefed; the court will address that motion after briefing is completed.

PRELIMINARY MATTERS

Before addressing Turner's motion for summary judgment, I begin with some preliminary matters.

**A. Video footage of November 26, 2019 incident**

Turner has filed a motion to compel discovery, Dkt. 56, along with two motions for sanctions regarding discovery issues, Dkt. 55 and Dkt. 66.

For instance, Turner seeks to compel defendants to turn over video footage from a November 26, 2019 incident in which he contends that prison staff ignored his threats of self-harm and delayed in getting him help after he overdosed on pills. Defendants responded to Turner's request for the footage by stating that there was none available, even though defendant Lebbeus Brown responded to an interrogatory stating that he preserved video footage of that incident. Dkt. 56-3, at 5. Turner seeks sanctions for defendants' spoliation of the footage.

Defendants have responded, stating that they were initially unable to locate footage in the electronic records archive where such footage was ordinarily stored. But litigation coordinator Ellen Ray made further efforts to locate the footage, recovered footage from the vestibule camera and officers' body cameras, and provided it to Turner. Defendants contend that Turner's motion to compel and for sanctions on this issue is moot. They also argue that Turner cannot show spoliation because the vestibule video doesn't help him: they say the video shows that Turner and defendant Stephen Schneider spoke about Turner using an electronic

kiosk, not about Turner's suicidal thoughts as he alleges. *See Norman-Nunnery v. Madison Area Tech. Coll.*, 625 F.3d 422, 428 (7th Cir. 2010) ("The crucial element in a spoliation claim is not the fact that the [evidence was] destroyed but that they were destroyed for the purpose of hiding adverse information.").

I do not agree with defendants that the vestibule video necessarily contradicts Turner's allegations that he and Schneider talked about his suicidal thoughts. As Turner points out, there is no audio accompanying the vestibule video so it is impossible to tell what the parties discussed. Nonetheless, defendants have produced all the footage they have regarding this incident.

In reply, Turner argues that the videos have been altered because they do not bear timestamps. That's not entirely accurate: the vestibule video does bear a timestamp but the bodycam videos do not. Turner also argues that other evidence contradicts Schneider's account of events, so he should be sanctioned. The mere lack of a timestamp doesn't show that defendants have tampered with the videos or committed any other sanctionable conduct. And inconsistencies or contradictions in the evidence are often a result of fallible human memory or other mistakes—Turner can point out discrepancies in Schneider's account at summary judgment and trial, but they do not necessarily show that a party is intentionally lying about an issue. Turner hasn't shown good reason to sanction defendants or any reason to compel further discovery, so I will deny his motions on this issue.

But the state should be aware that whatever minimal efforts they initially undertook to locate the footage was not enough, given their awareness that the footage could be located somewhere other than their electronic archive. In future cases, I expect state defendants to

double-check other potential repositories of footage before telling a plaintiff that the footage does not exist.

## B. Turner's second motion for sanctions

Turner has filed a second motion for sanctions, Dkt. 66, stating that defendants Mark Kartman and Lebbeus Brown knowingly gave false answers to interrogatories about an interview/information request form that Turner sent to Kartman in early March 2020. Both Kartman and Brown responded to his interrogatories by stating that they did not see that form. But the form itself shows that the document was received by someone at the prison, with Kartman's name crossed out and replaced with Brown's. Dkt. 56-7.

Defendants respond by stating that Kartman's recollection was refreshed by reviewing the form, which Turner filed as part of his motion to compel, and that Kartman amended his interrogatory response to say that he indeed forwarded it to Brown. That's another example of a sloppy discovery response, but also one that is not sanctionable. And the form itself does not prove that Brown saw the form, so it would be inappropriate to sanction defendants regarding Brown's answer. I will deny Turner's second motion for sanctions.

## C. Remaining requests to compel discovery

Turner asks the court to compel defendant Matthew Mutiva to disclose the identity of the supervisor whom Mutiva says he notified in early March 2020 that Turner wanted to be placed in observation. Defendants responded to a later discovery request with the identity of that supervisor: Captain Erica Collins. Turner says that this response is fabricated because Collins herself does not recall the incident. But parties sometimes disagree with each other over their recollection of facts without lying under oath. Mutiva has given his answer so there is nothing more to compel.

Turner wants defendant Brown to file a new answer to an interrogatory in which Turner asked him whether defendant Schneider told him that Schneider made specific comments to Turner during the November 26, 2019 incident. Brown did not answer that question "yes" or "no," instead recounting what Schneider told him and referring him to reports about that incident. Turner calls Brown's answer evasive, but an answer doesn't have to be "yes" or "no" to respond adequately; Brown explains what Schneider told him and he referred Turner to reports recounting the events. Brown's response was adequate so I will deny this portion of his motion to compel.

Turner seeks to compel different answers to his questions asking each of the defendants whether he "got 'interviewed' by a . . . psychologist or psychiatrist" between July 2016 and February 2017 and whether there were any "Psychological Diagnoses evaluations" made by medical staff from July 2016 to May 2019. Dkt. 56-1, at 7, 8. Most of the defendants—who are not medical professionals—stated that they could not respond because they did not have direct involvement with his medical care. Those are sufficient answers. Defendant Psychological Associate Angela Mink responded that his first request was ambiguous because Turner placed the word "interview" in quotations marks and she was unsure what he meant by that. But in both instances, she referred him to his medical records, which is sufficient for these particular interrogatories because they specifically relate to the medical treatment that would be memorialized in those records. *See* Fed. R. Civ. P. 33 "Option to Produce Business Records." And the parties' summary judgment filings show that they agree about when each appointment or other medical intervention occurred. I will deny this portion of Turner's motion to compel, and I will turn to Turner's motion for summary judgment.

UNDISPUTED FACTS

The following facts are undisputed unless otherwise noted.

Plaintiff Glenn T. Turner is a prisoner at Wisconsin Secure Program Facility (WSPF). Most of the defendants worked at WSPF during the times relevant to the case. Michael Roth was a correctional officer. Stephen Schneider and Matthew Mutiva were correctional sergeants. Angela Mink was a psychological associate. Lebbeus Brown was a unit supervisor. Mark Kartman was the security director. Gary Boughton was the warden. Defendant Kevin Kallas, who is named in his official capacity, works for the Department of Corrections as the Bureau of Health Services mental health director.

All inmates have access to the Psychological Services Unit (PSU) by making a request to see a clinician. Psychological services request forms are triaged by PSU staff every non-holiday weekday. When PSU staff are not onsite, the forms are triaged by Health Services Unit staff. If the request is deemed urgent or emergent, the inmate is seen the same day by a PSU staff member. There is a PSU clinician on-call during evening, weekends, and holidays. Otherwise, the inmate is placed on the PSU schedule for an appointment if the inmate checks the box indicating he would like to see psychology staff. PSU staff conducted rounds in Turner's unit at least once a week.

The WSPF PSU is staffed with the following positions: psychologist supervisor, psychologist-licensed, psychological associate-doctorate, and three psychological associates. There have been vacancies in these positions during the times relevant to this case, and it has been difficult for the state to fill vacancies given the pay offered and candidates' aversion to working at maximum-security institutions. There has always been at least one psychologist available to see inmates. Defendants say that inmates with routine requests are seen by a

psychologist within one to four weeks. There are also psychiatry staff available to meet with inmates by telemedicine; in January 2023 psychiatry staffing was increased from 12 to 16 hours a week to meet their increasing workload.

In 2016, Turner had a mental health diagnoses of antisocial personality disorder. According to defendants, his mental health classification was "MH-0" in 2016, meaning he had no documented mental health needs and did not require monitoring by PSU staff. Turner says that before coming to WSPF he had a diagnostic history of Axis I and Axis II psychological illnesses and personality disorders as follows: Axis I: schizophrenia paranoid type, depressive disorder NOS vs. major depression with psychotic features. Axis II: schizotypal personality disorder with paranoid and anti-social features.

In late July 2016, Turner submitted a psychological services request asking to be seen for anxiety, depression, and paranoia. Defendant Mink wrote back, stating that Turner would be seen for a psychology appointment within two to three weeks. The PSU rounds notes state that Dr. Sebranek saw Turner the next day and stated that Turner "chose not to engage with this clinician and turned down a puzzle packet [for cognitive stimulation]. No mental health concerns." Dkt. 96-1, at 118.

Mink stopped by Turner's cell the following three weeks on rounds, noting that Turner appeared to be asleep the first two weeks. *Id.* On August 17, 2016, Mink stated in the rounds report that Turner had no mental health concerns. They discussed Turner's frustration with not being placed in programming that he thought he should have given. Mink assessed Turner's mental status and did not note any problems. Defendants consider this meeting to be follow-up psychology appointment Mink mentioned in July. But I take Turner to be saying that they did not actually discuss his mental health problems because Mink refused to move the meeting

7

from Turner's cell front to somewhere that they could confidentially discuss his mental health symptoms.

Mink states that Turner would often raise concerns about his programming, but he never asked her for an out-of-cell appointment. He often would not engage in conversation with her. Turner was transferred to Dr. Scott Rubin-Asch's caseload.

On March 15, 2017, Dr. Hoem saw Turner at his cell front because he mentioned suicide in a letter reviewed by security staff. A couple days later, Turner told Hoem that administrative confinement was making him depressed. Hoem arranged for Turner to be seen by Rubin-Asch a couple weeks later. Defendants say that Rubin-Asch concluded that Turner did not present an acute risk of harm. Turner states that Rubin-Asch told him that he showed serious signs of post-traumatic stress disorder and asked him whether he wanted to be assessed for it. Turner said yes, but no follow up was performed. Turner submitted requests in April 2017, August 2018, and September 2018 about suffering from depression and anxiety, with Rubin-Asch stating that he would schedule an appointment. Rubin-Asch's waiting list was long: it was common for inmates to ask to be seen by him because he was a supervisor "and there was a perception that he would be able to do more for an inmate." Dkt. 92, at 48. It does not appear that Turner was seen by Rubin-Asch for a follow-up.

In February 2019, Mink referred Turner to a psychologist after Turner stated that he had mood swings, depression, and a lack of energy. Dr. Schwenn scheduled an appointment with Turner for February 27. When Schwenn went to meet with Turner, he refused to come out of his cell for the visit. Schwenn rescheduled for about a week later. Turner reported feeling depressed and he requested an appointment with a psychiatrist. Schwenn performed a suicide risk assessment. Turner denied thoughts of suicide or self-harm. Schwenn noted that Turner's

8

affect and actions during the appointment were not consistent with his reported depressive symptoms.

Turner states that anxiety and paranoia caused him to get into a fight with another inmate in late April 2019. Turner suffered pain, bruising, and swelling to his face, head, ribs, and chest.

In mid-May 2019, Turner filed an inmate grievance alleging that PSU staff were ignoring his requests for treatment. On May 30, the institution complaint examiner recommended that Turner win that grievance, stating that he had not been seen by a psychiatrist after Schwenn had referred him in early March. But the examiner noted that Turner was scheduled to see a psychiatrist that day (May 30). The reviewing authority rejected that recommendation and dismissed the grievance, stating that Turner turned down a clinician in late February, had been seen by staff several times in recent months, including a visit with a psychiatrist on May 31.

That May 31 appointment was with Dr. Singh-Gill by telemedicine; she prescribed Turner Zoloft. In September 2019, Turner met with Schwenn; Turner said he only sometimes took his medication because he did not like the side effects, which included being tired after taking it. Schwenn assessed Turner's mental health as stable.

Turner states that he had suicidal thoughts on November 26, 2019. Around 6:45 p.m., he used the intercom to call defendant Roth. Turner says that he told Roth that he was suicidal and wanted to speak to someone and go on observation status. Roth says that Turner did not mention suicidal thoughts but rather that he was "thinking about going on [observation]" after being upset about not being on the list to use the electronic kiosk inmates use to update their tablets and that he wanted Roth to contact a supervisor. Dkt. 99, at 2. Roth told defendant

Sergeant Schneider about Turner wanting to go on observation. Schneider said that he would talk to Turner on Schneider's recreation round (a round in which he asked inmates if they wanted outdoor recreation time). Roth also told non-defendant Lieutenant Kolbo about Turner wanting to talk to a supervisor.

A prison logbook states that Schneider started his recreation round at 5:30 p.m., which is before Turner says he called Roth on the intercom. Turner states that Schneider's round occurred at about 7:45 p.m. During his round Schneider spoke with Turner. Bodycam footage shows that they discussed Turner's frustration with not being placed on the kiosk list. Turner did not express any suicidal thoughts. *See* Dkt. 78-7 (placeholder docket entry for the bodycam footage).

Turner states that after the recreation round, Schneider returned to Turner's cell. Turner told Schneider that he was suicidal and needed to speak with someone. Schneider told him, "I don't see you trying to hurt yourself . . . and I don't believe that you're suicidal. So save that shit for third shift! Because it's Sergeant Tieriney who's screwing you over not me." Dkt. 60, at 16. Turner then picked up a card of pills that he thought were ibuprofen, showed them to Schneider, and said, "So you don't believe me?! I'm going to take all of these!" *Id.* at 17. Turner began taking the pills out of the card to ingest them. Turner says that Schneider walked away while saying, "Not my problem . . . take it up with third shift." *Id.* Schneider denies that he or Turner said any of these things. Instead, he states that they again discussed Turner's kiosk request, and that Schneider showed him paperwork relating to that. Defendants do not produce bodycam footage of this interaction; Schneider says "it was more likely than not that [he] forgot" to activate it. Dkt. 100, at 3.

Vestibule video of what appears to be this encounter shows Schneider flipping through a clipboard of paperwork, but there is no accompanying audio. *See* Dkt. 78-2 (placeholder for the vestibule footage).

About ten minutes later, Schneider returned to tell Turner that Lieutenant Kolbo would be coming down to talk with Turner. Turner says that Schneider saw him ingesting pills but walked away; Schneider denies this.

About ten minutes later, Kolbo came to Turner's cell, saw Turner ingesting pills, and called for help. Turner was taken to the emergency room. Turner says that he ingested more than 30 pills, a combination of ibuprofen and sumatriptan, a migraine medication. Turner felt sharp abdominal pains, nausea, lightheadedness, and he developed diarrhea. He also says that he suffered kidney damage.

Hospital records showed that poison control considered Turner to have ingested Turner ingested a "subtoxic" amount of ibuprofen and that the migraine medication might cause him high blood pressure for a couple of hours.

After Turner came back to WSPF, PSU staff evaluated him at least twice the next few days and discussed with him ways to cope with frustration. Turner was released from observation and placed on paper and "keep on person" medication restrictions.

Turner was seen next in February 2020 by Dr. Ekonomou. She concluded that although Turner expressed frustration, agitation, anger, and mood swings, he was not homicidal, suicidal, or psychotic. Ekonomou changed Turner's prescription to Lexapro.

Turner states that he again had suicidal thoughts on the night of March 7, 2020. He told non-defendant Correctional Officer Knockel that he was suicidal and that he wanted to go on observation status. Knockel told Turner to use his intercom to call the sergeant. Turner

11

called defendant Mutiva. Turner says that he told Mutiva that he was suicidal and wanted to go to observation, but Mutiva clicked off the intercom without responding. Turner had another inmate, Theraon Wells, use his intercom and call Mutiva to tell him that Turner was suicidal, with Mutiva responding with something like, "What does that have to do with you?" Dkt. 60, at 21. Turner states that he tried calling Mutiva several more times, with Mutiva finally responding, "You do what you got to do, I'm not calling a supervisor." *Id.* Turner did not harm himself. At the start of the next shift another supervisor spoke with Turner and told him to file an inmate complaint.

Mutiva disputes much of Turner's account. Mutiva states that Turner did call him on the intercom, but only to say that he wanted to go on observation, not that he was suicidal. Mutiva asked Turner why he wanted to go on observation and he only repeated that he wanted to go into observation. Mutiva says that in his experience, it is "not uncommon for inmates to attempt to get into observation for various reasons, such as communicating with inmates who are housed in other areas." Dkt. 98, at 4. Then Turner continued to call him on the intercom, but when Mutiva would answer, Turner would say nothing. Mutiva does not dispute that inmate Theraon Wells called him and stated that Turner was suicidal; Mutiva says that he responded by telling Wells that he had tried talking to Turner on the intercom but Turner would not talk to him. Mutiva also knew that Officer Knockel was at Turner's cell front addressing his complaints: Knockel told him that Turner wanted to go into observation but that he did not make any type of statement that he was thinking of hurting himself or feeling suicidal. Mutiva also reported to a supervisor performing medication pass that Turner wanted to go into observation but that Turner did not state that he was having thoughts of self-harm.

12

In early February 2021, Turner saw Michael Field, a psychiatric advanced practice nurse prescriber. He reviewed Turner's medication history, noting that Turner had stopped taking Zoloft on his own. Field also noted that Turner stopped taking Lexapro after approximately a month. Turner reported ongoing depression and anxiety but denied any thoughts of wanting to harm himself or others. Field concluded that Turner had not been consistently taking a psychotropic medication for long enough to determine whether it was effective in helping to address his reported anxiety and depression. Turner agreed to resume Lexapro to determine whether it was effective in addressing his depression and anxiety. Field updated Turner's diagnoses include unspecified anxiety and depression.

In early March 2021, Field had an appointment with Turner in which Turner reported that he had stopped taking Lexapro, and that staff found him hoarding pills in his cell and had placed Turner on a no "keep on person" restriction. Turner refused to take his medication while he was on this restriction. Field discontinued Turner's prescription.

In late June 2022, Field saw Turner to discuss his request to resume a psychotropic medication. He reported situational anxiety and depression, with an emphasis on social anxiety. Field noted a diagnosis of unspecified anxiety disorder and he resumed Turner's prescription for Lexapro.

In early October 2022, Field saw Turner for a follow-up appointment. Turner reported that his mood had stabilized, and that he was not taking his Lexapro on a regular basis because he sometimes forgot to take it. Field again counseled Turner on the importance of taking his medication on a consistent basis. Field stated that he will continue to follow-up with Turner every two to three months, or sooner if Turner requests.

I will discuss additional facts as they become relevant to the analysis.

13

ANALYSIS

Turner brings the following claims:

- An Eighth Amendment claim against defendant Mink for failing to follow up with him for months on his reports of depression and anxiety.

- Eighth Amendment individual-capacity claims and state-law negligence claims against defendants Roth, Schneider, Mutiva, Brown, Kartman, and Boughton for failing to address his warnings of self-harm.

- An Eighth Amendment official-capacity claim for injunctive relief against defendant Kallas about prison policies and practices causing PSU staffing shortages that resulted in severe delays in treatment.

Turner's claim against Mink has already survived the summary judgment stage: after denying the state defendants' motion for summary judgment on that claim in Case No. 17-cv-203-jdp, I severed the claim from that case and consolidated it with Turner's similar mental health care claims in this lawsuit. *See Turner v. Boughton*, No. 17-cv-203-jdp, 2021 WL 1200597, at *1 (W.D. Wis. Mar. 30, 2021). I will not address that claim in this order.

**A. Individual-capacity claims for failure to address warnings of self-harm**

Turner brings Eighth Amendment and negligence claims against several of the defendants for disregarding his threats of self-harm on November 26, 2019, and March 7, 2020.

Prison officials violate the Eighth Amendment if they are aware of an objectively serious risk of harm to an inmate and knowingly or recklessly disregard it. *Farmer v. Brennan*, 511 U.S. 825, 846 (1994). To prevail on his Eighth Amendment claims, Turner would need to prove that: (1) defendants knew of a strong likelihood that Turner would seriously harm himself; (2) defendants consciously failed to take reasonable measures to prevent the harm; and (3) defendants' action or inaction caused Turner harm. *See Lord v. Beahm*, 952 F.3d 902, 905

14

(7th Cir. 2020); *Rice ex rel. Rice v. Corr. Med. Servs.*, 675 F.3d 650 (7th Cir. 2012). Under Wisconsin law, a claim for negligence "requires the following four elements: (1) a breach of (2) a duty owed (3) that results in (4) an injury or injuries, or damages." *Paul v. Skemp*, 2001 WI 42, ¶ 17, 242 Wis. 2d 507, 625 N.W.2d 860.

To succeed on his motion for summary judgment, Turner must show that there is no genuine issue of material fact and that he is entitled to judgment in his favor as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). All reasonable inferences from the facts in the summary judgment record must be drawn in the nonmoving party's favor—in this instance, defendants' favor. *Baron v. City of Highland Park*, 195 F.3d 333, 338 (7th Cir. 1999). Turner is not entitled to summary judgment on his claims about either incident.

There are disputed issues of material fact regarding the November 26, 2019 incident: Turner states that he told both Schneider and Roth that he was suicidal. He also states that he told Schneider that he was going to ingest many pills and that he took some of those pills in front of Schneider, with Schneider doing nothing to help him. But defendants dispute most aspects of Turner's account. They say that Turner didn't tell Roth or Schneider that he was suicidal, and that Roth responded to Turner's statement that he wanted to go to observation by informing both Schneider and Kolbo. Schneider denies that Turner said he was suicidal, took pills in front of him, or that he gave flippant responses to Turner's pleas for help; instead their discussions focused on Turner's frustrations about not being placed on the kiosk list. Because a reasonable jury could believe Roth's and Schneider's version of events, conclude that they did not ignore complaints of suicidal thoughts, and thus find in their favor on Turner's

15

Eighth Amendment and negligence claims, I cannot grant Turner summary judgment on those claims.

There are also disputed issues of material fact regarding the March 7, 2020 incident. Turner states that Mutiva ignored or rejected both his and inmate Wells's calls stating that Turner had suicidal thoughts. But Mutiva says that Turner never stated that he had suicidal thoughts, rather only that he wanted to go to observation without a stated reason. I take Mutiva to be saying that he did not consider Turner's requests genuine because inmates would sometimes seek to be placed in observation for illegitimate reasons. He concedes that Wells called him to state that Turner was suicidal, but Mutiva didn't believe him. He instead relied on the report of Officer Knockel, who stated that Turner was only stating that he wanted to go on observation and not saying that he had thoughts of self-harm. There is also no evidence that Turner actually harmed himself in this incident. *See Henry v. Deshler*, No. 20-2185, 2021 WL 2838400, at *2 (7th Cir. July 8, 2021) (prisoner cannot succeed on a claim for damages based on a risk that did not come to pass) (citing *Lord v. Beahm*, 952 F.3d 902, 905 (7th Cir. 2020). Because a reasonable jury crediting Mutiva's version of events could find that Mutiva responded reasonably to Turner's vague requests to be placed in observation, I will deny Turner's motion for summary judgment on his claims against Mutiva.

Turner also brings Eighth Amendment and negligence claims against defendant supervisors Lebbeus Brown, Mark Kartman, and Gary Boughton for failing to respond to his complaints that unit staff do not address suicidal behavior until the person actually commits an act of self-harm. But because a reasonable jury could find in defendants' favor for both underlying incidents that he cites to support his claims against the supervisors, a jury could

16

also find that the supervisors didn't ignore an ongoing risk to inmates like Turner. So I will deny his motion for summary judgment on his claims against the supervisors.

## B. Official-capacity claims about treatment delays caused by staffing policies

Turner contends that state policies caused staffing shortages that resulted in severe delays in his mental health treatment. This is an official-capacity claim against Kallas for injunctive relief. To show that he is entitled to injunctive relief on this claim, he needs to prove that a policy or custom of the state played a part in the alleged constitutional deprivation. *Kentucky v. Graham*, 473 U.S. 159, 166 (1985)). Turner faces a high burden on this claim: this court is limited to ordering injunctive relief that "is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right." *See* 18 U.S.C. § 3626(a)(1)(A).

I conclude that Turner is unable to show that he is entitled to injunctive relief as a matter of law, which is what would be required for me to enter summary judgment in his favor on this claim. The parties have submitted evidence showing that the PSU continues to have vacancies and that for at least some of the time discussed in this opinion—particularly a gap from April 2017 to February 2019—Turner failed to receive follow-up care at least in part because of a long wait list.

But Turner's treatment has improved since then, including him seeing psychiatric nurse practitioner Field several times since 2021, with Field ready to see Turner every few months. And Turner continues to be able to meet with PSU staff during rounds and by request. Drawing inferences from the record in defendants' favor, the biggest problem with Turner's recent treatment seems to be his reluctance to continue taking his prescribed medication, not his practitioners' availability. Therefore Turner falls short of showing that he is entitled to

17

injunctive relief as a matter of law. So I will deny Turner's motion for summary judgment on this claim. I will rule on defendants' cross-motion for summary judgment after briefing is completed on it.

ORDER

IT IS ORDERED that:

1. Plaintiff Glenn Turner's motions for sanctions, Dkt. 55 and Dkt. 66, are DENIED.
2. Plaintiff's motion to compel discovery, Dkt. 56, is DENIED.
3. Plaintiff's motion for summary judgment, Dkt. 58, is DENIED.

Entered March 13, 2023.

BY THE COURT:

/s/

_____
JAMES D. PETERSON
District Judge