IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

GLENN T. TURNER,

                Plaintiff,

     v.

GARY BOUGHTON, LEBBEUS BROWN,
MARK KARTMAN, KEVIN KALLAS,
MICHAEL ROTH, STEPHEN SCHNEIDER,
MATTHEW MUTIVA, and ANGELA MINK,

                Defendants.

OPINION and ORDER

19-cv-1001-jdp

---

Plaintiff Glenn T. Turner, appearing pro se, is a prisoner at Wisconsin Secure Program Facility. Turner contends that defendant prison officials failed to treat his mental health problems in various ways. In particular, he alleges that Psychological Services Unit staffing shortages caused severe delays in his treatment, that correctional officers refused to intervene when he told them that he had thoughts of self-harm, and that a psychological unit staff member failed to follow up with him for months on his reports of depression and anxiety. He brings claims under the Eighth Amendment to the United States Constitution and Wisconsin negligence law.

I previously denied Turner's motion for summary judgment. *See* Dkt. 118. Defendants have filed a motion for summary judgment, Dkt. 91, that I will grant in most respects. But I previously denied defendants summary judgment on a claim that I then consolidated into this case—that defendant Angela Mink failed to follow up with Turner for months on his reports of depression and anxiety. That claim will proceed to trial.

UNDISPUTED FACTS

The following facts are undisputed unless otherwise noted.[1]

## A.  Parties

Plaintiff Glenn T. Turner is a prisoner at Wisconsin Secure Program Facility (WSPF). Most of the defendants worked at WSPF during the times relevant to the case. Michael Roth was a correctional officer. Stephen Schneider and Matthew Mutiva were correctional sergeants. Angela Mink was a psychological associate. Lebbeus Brown was a unit supervisor. Mark Kartman was the security director. Gary Boughton was the warden. Defendant Kevin Kallas, who is named in his official capacity, works for the Department of Corrections as the Bureau of Health Services mental health director.

## B.  Turner's mental health care

Most of Turner's claims involve two incidents—on November 26, 2019, and March 7, 2020—in which Turner told officials that he had thoughts of self-harm. But Turner also brings a claim about WSPF staffing shortages resulting in severe delays in his mental health treatment, so I will discuss Turner's mental health treatment history more generally.

All inmates have access to the Psychological Services Unit (PSU) by making a request to see a clinician. Psychological services request forms are triaged by PSU staff every non-holiday weekday. When PSU staff are not onsite, the forms are triaged by Health Services Unit staff. If the request is deemed urgent or emergent, the inmate is seen the same day by a PSU staff member. There is a PSU clinician on-call during evening, weekends, and holidays.

---

[1] Turner filed a motion for an extension of time to submit his summary judgment opposition materials, Dkt. 109, and defendants filed a motion for an extension of time to file their reply, Dkt. 117. I will grant both of these motions and consider the parties' submissions.

Otherwise, the inmate is placed on the PSU schedule for an appointment if the inmate checks the box indicating he would like to see psychology staff. PSU staff conducted rounds in Turner's unit at least once a week.

The WSPF PSU is staffed with the following positions: psychologist supervisor, psychologist-licensed, psychological associate-doctorate, and three psychological associates. There have been vacancies in these positions during the times relevant to this case, and it has been difficult for the state to fill vacancies given the pay offered and candidates' aversion to working at maximum-security institutions. There has always been at least one psychologist available to see inmates. Defendants say that inmates with routine requests are seen by a psychologist within one to four weeks. There are also psychiatry staff available to meet with inmates by telemedicine. In January 2023 psychiatry staffing was increased from 12 to 16 hours a week to meet their increasing workload.

In 2016, Turner had a mental health diagnosis of antisocial personality disorder. According to defendants, his mental health classification was "MH-0" in 2016, meaning he had no documented mental health needs and did not require monitoring by PSU staff. Turner says that before coming to WSPF he had a diagnostic history of Axis I and Axis II psychological illnesses and personality disorders as follows: Axis I: schizophrenia paranoid type, depressive disorder NOS vs. major depression with psychotic features. Axis II: schizotypal personality disorder with paranoid and anti-social features.

In late July 2016, Turner submitted a psychological services request asking to be seen for anxiety, depression, and paranoia. Defendant Mink wrote back, stating that Turner would be seen for a psychology appointment within two to three weeks. The PSU rounds notes state that Dr. Sebranek saw Turner the next day and stated that Turner "chose not to engage with

this clinician and turned down a puzzle packet [for cognitive stimulation]. No mental health concerns." Dkt. 96-1, at 118.

Mink stopped by Turner's cell the following three weeks on rounds, noting that Turner appeared to be asleep the first two weeks. *Id.* On August 17, 2016, Mink stated in the rounds report that Turner had no mental health concerns. They discussed Turner's frustration with not being placed in programming that he thought he should have given. Mink assessed Turner's mental status and did not note any problems. Defendants consider this meeting to be follow-up psychology appointment Mink mentioned in July. But I take Turner to be saying that they did not actually discuss his mental health problems because Mink refused to move the meeting from Turner's cell front to somewhere that they could confidentially discuss his mental health symptoms.

Mink states that Turner would often raise concerns about his programming, but he never asked her for an out-of-cell appointment. He often would not engage in conversation with her. Turner was transferred to Dr. Scott Rubin-Asch's caseload.

On March 15, 2017, Dr. Hoem saw Turner at his cell front because he mentioned suicide in a letter reviewed by security staff. A couple days later, Turner told Hoem that administrative confinement was making him depressed. Hoem arranged for Turner to be seen by Rubin-Asch a couple weeks later. Defendants say that Rubin-Asch concluded that Turner did not present an acute risk of harm. Turner states that Rubin-Asch told him that he showed serious signs of post-traumatic stress disorder and asked him whether he wanted to be assessed for it. Turner said yes, but no follow up was performed.

Turner submitted requests in April 2017, August 2018, and September 2018 about suffering from depression and anxiety, with Rubin-Asch stating that he would schedule an

appointment. Rubin-Asch's waiting list was long: it was common for inmates to ask to be seen by him because he was a supervisor "and there was a perception that he would be able to do more for an inmate." Dkt. 92, at 48. It does not appear that Turner was seen by Rubin-Asch for a follow-up.

In February 2019, Mink referred Turner to a psychologist after Turner stated that he had mood swings, depression, and a lack of energy. Dr. Schwenn scheduled an appointment with Turner for February 27. When Schwenn went to meet with Turner, he refused to come out of his cell for the visit. Schwenn rescheduled for about a week later. Turner reported feeling depressed and he requested an appointment with a psychiatrist. Schwenn performed a suicide risk assessment. Turner denied thoughts of suicide or self-harm. Schwenn noted that Turner's affect and actions during the appointment were not consistent with his reported depressive symptoms.

Turner states that anxiety and paranoia caused him to get into a fight with another inmate in late April 2019. In mid-May 2019, Turner filed an inmate grievance alleging that PSU staff were ignoring his requests for treatment. On May 30, the institution complaint examiner recommended that Turner win that grievance, stating that he had not been seen by a psychiatrist after Schwenn had referred him in early March. But the examiner noted that Turner was scheduled to see a psychiatrist that day (May 30). The reviewing authority rejected that recommendation and dismissed the grievance, stating that Turner turned down a clinician in late February, had been seen by staff several times in recent months, including a visit with a psychiatrist on May 31.

That May 31 appointment was with Dr. Singh-Gill by telemedicine; she prescribed Turner Zoloft. In September 2019, Turner met with Schwenn; Turner said he only sometimes

took his medication because he did not like the side effects, which included being tired after taking it. Schwenn assessed Turner's mental health as stable.

## C.  November 26, 2019 incident

On November 26, 2019, around 6:45 p.m., Turner used the intercom to call defendant Roth. Turner says that he told Roth that he was suicidal and wanted to speak to someone and go on observation status. Roth says that Turner did not mention suicidal thoughts but rather that he was "thinking about going on [observation]" after being upset about not being on the list to use the electronic kiosk inmates use to update their tablets and that he wanted Roth to contact a supervisor. Dkt. 99, at 2. Roth told defendant Sergeant Schneider about Turner wanting to go on observation. Schneider said that he would talk to Turner on Schneider's recreation round (a round in which he asked inmates if they wanted outdoor recreation time). Roth also told non-defendant Lieutenant Kolbo about Turner wanting to talk to a supervisor.

A prison logbook states that Schneider started his recreation round at 5:30 p.m., which is before Turner says he called Roth on the intercom. Turner states that Schneider's round occurred at about 7:45 p.m. During his round Schneider spoke with Turner. Bodycam footage shows that they discussed Turner's frustration with not being placed on the kiosk list. Turner did not express any suicidal thoughts. *See* Dkt. 78-7 (placeholder docket entry for the bodycam footage).

Turner states that after the recreation round, Schneider returned to Turner's cell. Turner told Schneider that he was suicidal and needed to speak with someone. Schneider told him, "I don't see you trying to hurt yourself . . . and I don't believe that you're suicidal. So save that shit for third shift! Because it's Sergeant Tieriney who's screwing you over not me." Dkt. 60, at 16. Turner then picked up a card of pills that he thought were ibuprofen, showed

6

them to Schneider, and said, "So you don't believe me?! I'm going to take all of these!" *Id.* at 17. Turner began taking the pills out of the card to ingest them. Turner says that Schneider walked away while saying, "Not my problem . . . take it up with third shift." *Id.* Schneider denies that he or Turner said any of these things. Instead, he states that they again discussed Turner's kiosk request, and that Schneider showed him paperwork relating to that. Defendants do not produce bodycam footage of this interaction; Schneider says "it was more likely than not that [he] forgot" to activate it. Dkt. 100, at 3. Vestibule video of what appears to be this encounter shows Schneider flipping through a clipboard of paperwork, but there is no accompanying audio. *See* Dkt. 78-2 (placeholder for the vestibule footage).

About ten minutes later, Schneider returned to tell Turner that Lieutenant Kolbo would be coming down to talk with Turner. Turner says that Schneider saw him ingesting pills but walked away; Schneider denies this.

About ten minutes later, Kolbo came to Turner's cell, saw Turner ingesting pills, and called for help. Turner was taken to the emergency room. Turner says that he ingested about 40 ibuprofen 400 mg and two tablets of sumatriptan, a migraine medication. Turner felt sharp abdominal pains, nausea, lightheadedness, and he developed diarrhea. Hospital officials called poison control, who considered Turner to have ingested a "subtoxic" amount of ibuprofen and that the migraine medication might cause him high blood pressure for a couple of hours. Poison control recommended that the hospital monitor Turner for four hours from the time of ingestion and that he be given a toxicology screening, activated charcoal, and medication for nausea and acid reflux.

Turner was released from the emergency room to WSPF after a few hours of monitoring, with the recommendation that he take Prilosec (an over-the-counter proton pump inhibitor)

for a week. Turner was discharged without the need for any follow-up other than with a psychiatrist. PSU staff evaluated him at least twice over the next few days and discussed with him ways to cope with frustration. Turner was released from observation and placed on paper and "keep on person" medication restrictions.

**D. March 7, 2020 incident**

The night of March 7, 2020, Turner told non-defendant Correctional Officer Knockel that he was suicidal and that he wanted to go on observation status. Knockel told Turner to use his intercom to call the sergeant. Turner called defendant Mutiva. Turner says that he told Mutiva that he was suicidal and wanted to go to observation, but Mutiva clicked off the intercom without responding. Turner had another inmate, Theraon Wells, use his intercom and call Mutiva to tell him that Turner was suicidal, with Mutiva responding with something like, "What does that have to do with you?" Dkt. 60, at 21. Turner states that he tried calling Mutiva several more times, with Mutiva finally responding, "You do what you got to do, I'm not calling a supervisor." *Id.* Turner did not harm himself. At the start of the next shift another sergeant spoke with Turner and said that he would contact a supervisor. He also told Turner to file an inmate complaint.

Mutiva disputes much of Turner's account. Mutiva states that Turner did call him on the intercom, but only to say that he wanted to go on observation, not that he was suicidal. Mutiva asked Turner why he wanted to go on observation and he only repeated that he wanted to go into observation. Mutiva says that in his experience, it is "not uncommon for inmates to attempt to get into observation for various reasons, such as communicating with inmates who are housed in other areas." Dkt. 98, at 4. Then Turner continued to call him on the intercom, but when Mutiva would answer, Turner would say nothing. Mutiva does not dispute that

8

inmate Theraon Wells called him and stated that Turner was suicidal; Mutiva says that he responded by telling Wells that he had tried talking to Turner on the intercom but Turner would not talk to him. Mutiva also knew that Officer Knockel was at Turner's cell front addressing his complaints: Knockel told him that Turner wanted to go into observation but that he did not make any type of statement that he was thinking of hurting himself or feeling suicidal. Mutiva also reported to a supervisor performing medication pass that Turner wanted to go into observation but that Turner did not state that he was having thoughts of self-harm.

### E.  Turner's remaining care

About three weeks before the March 7, 2020 incident, Turner was seen by Dr. Ekonomou. She concluded that although Turner expressed frustration, agitation, anger, and mood swings, he was not homicidal, suicidal, or psychotic. Ekonomou changed Turner's prescription to Lexapro.

In early February 2021, Turner saw Michael Field, a psychiatric advanced practice nurse prescriber. He reviewed Turner's medication history, noting that Turner had stopped taking Zoloft on his own. Field also noted that Turner stopped taking Lexapro after approximately a month. Turner reported ongoing depression and anxiety but denied any thoughts of wanting to harm himself or others. Field concluded that Turner had not been consistently taking a psychotropic medication for long enough to determine whether it was effective in helping to address his reported anxiety and depression. Turner agreed to resume Lexapro to determine whether it was effective in addressing his depression and anxiety. Field updated Turner's diagnoses include unspecified anxiety and depression.

In early March 2021, Field had an appointment with Turner in which Turner reported that he had stopped taking Lexapro, and that staff found him hoarding pills in his cell and had

placed Turner on a no "keep on person" restriction. Turner refused to take his medication while he was on this restriction. Field discontinued Turner's prescription.

In late June 2022, Field saw Turner to discuss his request to resume a psychotropic medication. He reported situational anxiety and depression, with an emphasis on social anxiety. Field noted a diagnosis of unspecified anxiety disorder and he resumed Turner's prescription for Lexapro.

In early October 2022, Field saw Turner for a follow-up appointment. Turner reported that his mood had stabilized, and that he was not taking his Lexapro on a regular basis because he sometimes forgot to take it. Field again counseled Turner on the importance of taking his medication on a consistent basis. Field stated that he will continue to follow-up with Turner every two to three months, or sooner if Turner requests.

I will discuss additional facts as they become relevant to the analysis.

ANALYSIS

Turner brings the following claims:

- An Eighth Amendment claim against defendant Mink for failing to follow up with him for months on his reports of depression and anxiety.

- Eighth Amendment individual-capacity claims and state-law negligence claims against defendants Roth, Schneider, Mutiva, Brown, Kartman, and Boughton for failing to address his warnings of self-harm.

- An Eighth Amendment official-capacity claim for injunctive relief against defendant Kallas about prison policies and practices causing PSU staffing shortages that resulted in severe delays in treatment.

**A.  Eighth Amendment claim against Mink**

Turner's claim against Mink has already survived the summary judgment stage: after denying the state defendants' motion for summary judgment on that claim in

Case No. 17-cv-203-jdp, I severed the claim from that case and consolidated it with Turner's similar mental health care claims in this lawsuit. *See Turner v. Boughton*, No. 17-cv-203-jdp, 2021 WL 1200597, at *1 (W.D. Wis. Mar. 30, 2021). I need not address the merits of that claim in this order.

## B. Eighth Amendment and negligence claims about warnings of self-harm

### 1. Claims against staff directly responding to warnings

Turner brings Eighth Amendment and negligence claims against several of the defendants for disregarding his threats of self-harm on November 26, 2019, and March 7, 2020.

Prison officials violate the Eighth Amendment if they are aware of an objectively serious risk of harm to an inmate and knowingly or recklessly disregard it. *Farmer v. Brennan*, 511 U.S. 825, 846 (1994). To prevail on his Eighth Amendment claims, Turner would need to prove that: (1) defendants knew of a strong likelihood that Turner would seriously harm himself; (2) defendants consciously failed to take reasonable measures to prevent the harm; and (3) defendants' action or inaction caused Turner harm. *See Lord v. Beahm*, 952 F.3d 902, 905 (7th Cir. 2020); *Rice ex rel. Rice v. Corr. Med. Servs.*, 675 F.3d 650 (7th Cir. 2012). Under Wisconsin law, a claim for negligence "requires the following four elements: (1) a breach of (2) a duty owed (3) that results in (4) an injury or injuries, or damages." *Paul v. Skemp*, 2001 WI 42, ¶ 17, 242 Wis. 2d 507, 625 N.W.2d 860.

#### a. November 26, 2019 incident

There are disputed issues of fact regarding the November 26, 2019 incident: Turner states that he told both Schneider and Roth that he was suicidal. He also states that he told Schneider that he was going to ingest many pills and that he took some of those pills in front

of Schneider, with Schneider doing nothing to help him. Defendants dispute most aspects of Turner's account. They say that Turner didn't tell Roth or Schneider that he was suicidal, and that Roth responded to Turner's statement that he wanted to go to observation by informing both Schneider and Kolbo. Schneider denies that Turner said he was suicidal, took pills in front of him, or that he gave flippant responses to Turner's pleas for help; instead their discussions focused on Turner's frustrations about not being placed on the kiosk list.

Even resolving these factual disputes in Turner's favor, his claims against Roth fail because Roth took reasonable steps to check on him. Turner doesn't have personal knowledge of Roth's response and doesn't present any evidence disputing defendants' account that Roth notified Schneider about Turner wanting to go on observation. Roth's decision to have Schneider intervene shows that he did not disregard Turner's condition or otherwise breach a duty owed to Turner. So I will grant summary judgment to defendants on Turner's claims against Roth.

Defendants argue that they should also be granted summary judgment on Turner's claims against Schneider because he responded reasonably to Turner's problem. But Turner's account suggests that Schneider acted unreasonably by disregarding Turner's condition even after he began ingesting pills. So defendants are not entitled to summary judgment on the claims against Schneider based on this argument.

But defendants have an argument with more traction: that Turner cannot succeed on his claims against Schneider because he fails to show that he was harmed by the medication he consumed. *See Lord v. Beahm*, 952 F.3d 902, 905 (7th Cir. 2020) ("risk is not compensable without evidence of injury"); *Hennekens v. Hoerl*, 160 Wis. 2d 144, 465 N.W.2d 812, 816 (1991) (plaintiff must identify evidence that defendants' actions caused him "actual damage.").

Defendants note that poison control told the hospital that the amount of ibuprofen Turner says he consumed was "subtoxic" and that the sumatriptan would cause only short-term hypertension. But that was based on Turner's contemporaneous report to hospital officials that he had consumed 25 to 30 ibuprofen tablets and 4 to 5 sumatriptan tablets. At summary judgment, Turner states that he actually consumed about 40 ibuprofen tablets and two sumatriptan tablets. Given this discrepancy I cannot rely on poison control's analysis of his Turner's earlier estimate.

The parties disagree about the significance of Turner's toxicology testing following the overdose. Turner notes that his glucose level tested above the reference range and he cites other results—creatinine, Blood urea nitrogen, and anion gap—that did *not* fall outside their respective reference ranges, believing that they indicate damage to his kidneys. *See* Dkt. 86-1, at 8. He also presents testing from about two and a half years later showing a very similar creatinine result (1.18 in July 2022 vs. 1.19 in November 2019) that was nonetheless considered above normal, and showing a glucose level below normal. Dkt. 113-6, at 1. He states that his physician at WSPF, Justin Ribault, told him that these results reflected problems with his kidney function. But Ribault's purported statement is hearsay and Turner doesn't provide any medical records or other evidence supporting that alleged diagnosis.

Defendants provide a declaration from Ribault stating that Turner's testing after the November 2019 incident was normal. Ribault also states that Turner's kidney function as indicated by that testing was similar to previous lab results, although he doesn't provide evidence supporting that assertion so I will disregard it. Nonetheless, it is Turner's burden to present facts showing that his overdose caused those lab results, and he does not have the expertise to say that they did. Turner's mere speculation that his elevated glucose level or any

of his other results were caused by the overdose does not raise a reasonable inference that his overdose was indeed the cause. *See, e.g.*, *Herzog v. Graphic Packaging Int'l, Inc.*, 742 F.3d 802, 806 (7th Cir. 2014) (While nonmovant "is entitled . . . to all reasonable inferences in her favor, inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion." (citation omitted)).

Besides the lab results, Turner states that he has other evidence of harm: he says that he felt sharp abdominal pains, nausea, lightheadedness, and he developed diarrhea. Consistent with the hospital's prescription of Prilosec, Ribault describes Turner's short-lived "epigastric pain" as indigestion or acid reflux. Turner also suffered a brief period of high blood pressure at the hospital that had returned to normal by the time he was sent back to WSPF. But minor injuries are not sufficient to support an Eighth Amendment claim. *See Lord*, 952 F.3d at 905 ("minor scratches, quickly and easily treated with a gauze bandage"); *Gayton v. McCoy*, 593 F.3d 610, 621 (7th Cir. 2010) ("Vomiting, in and of itself, is not an uncommon result of being mildly ill, and, absent other circumstances . . . does not amount to an objectively serious medical condition."); *Madlock v. Shannon*, No. 19-cv-410-jdp, 2021 WL 980916, at *2 (W.D. Wis. Mar. 16, 2021) ("[A] single incident of vomiting and feeling 'a little lightheaded' . . . don't rise to the level of a constitutional harm."). Turner's symptoms following his overdose are only minor problems insufficient to support an Eighth Amendment claim.

Such minor harms might support a Wisconsin-law negligence claim against Schneider, but I must dismiss that claim because Turner failed to comply with Wisconsin's notice-of-claim statute, Wis. Stat. § 893.82. That statute provides that a claimant bringing a civil action against a state employee must serve written notice of the claim on Wisconsin's attorney general within 120 days of the event giving rise to the action. Wis. Stat. § 893.82(3). The statute requires

strict compliance. *Riccitelli v. Broekhuizen*, 595 N.W.2d 392, 399, 227 Wis. 2d 100 (1999). It is undisputed that Turner filed his notice of claim about the incident on May 8, 2020, more than 120 days after the incident. Turner states that Schneider's misconduct was part of an ongoing practice of WSPF officials to disregard inmates' warnings of suicidal ideation, which I take to be an argument that he was free to file a notice of claim at any time within 120 days of the ongoing practice still occurring. But the "continuing violation doctrine" does not apply to the Wisconsin's notice-of-claim statute for claims against municipal entities, and there is no reason to think that Wisconsin courts would treat the parallel provisions of § 893.82 differently. *See E-Z Roll Off, LLC v. County of Oneida*, 2011 WI 71, ¶ 46 n.16, 335 Wis. 2d 720, 800 N.W.2d 421 ("The manifest intent of the legislature in Wis. Stat. § 893.80 is not to expose governmental entities to potentially infinite periods of liability."); *Atwater v. Gugler*, No. 19-CV-363, 2020 WL 3258767, at *2 (E.D. Wis. June 16, 2020) (dismissing negligence claim against state defendants, citing *E-Z Roll Off*).

I will grant defendants' motion for summary judgment on Turner's claims against Schneider.

### b.  March 7, 2020 incident

There are also disputed issues of fact regarding Turner's and inmate Wells's calls to Mutiva about Turner's suicidal thoughts or requests to go on observation status. But there is no evidence that Turner actually harmed himself in this incident. *See Henry v. Deshler*, No. 20-2185, 2021 WL 2838400, at *2 (7th Cir. July 8, 2021) (prisoner cannot succeed on a claim for damages based on a risk that did not come to pass (citing *Lord*, 952 F.3d at 905)). So I will grant summary judgment to defendants on Turner's claims against Mutiva.

### 2.  Claims against supervisors

Turner also brings Eighth Amendment and negligence claims against defendant supervisors Lebbeus Brown, Mark Kartman, and Gary Boughton for failing to respond to his complaints that unit staff do not address suicidal behavior until the person actually commits an act of self-harm. But his claims against the supervisors are based on the underlying November 26, 2019 and March 7, 2020 incidents. Because Turner's claims directly about those incidents fail on the grounds that he cannot show that he suffered serious enough harm and that he filed his notice of claim too late, I will dismiss his claims for damages against the supervisors for the same reasons.

If what Turner seeks is a permanent injunction against a practice of staff refusing to help suicidal inmates until they actually harm themselves, that claim also fails. Even resolving all factual disputes in Turner's favor, he has at most shown years-old isolated instances in which certain staff members have refused to assist him. And even in the March 7, 2020 incident, another sergeant ultimately did assist Turner without Turner harming himself, undermining his assertion that the unit staff wouldn't help inmates until they harmed themselves. Turner also concedes that he was placed in observation at least one other time during his time in the unit, with no indication that he harmed himself before being placed there. *See* Dkt. 111 at 14, ¶ 66 (Turner placed in observation in September 2022). Because he fails to show that he faces irreparable harm without injunctive relief, I will grant summary judgment to defendants on this aspect of Turner's claims.

16

**C. Eighth Amendment claim for injunctive relief about treatment delays caused by staffing policies**

Turner contends that state policies cause staffing shortages that have resulted in severe delays in his mental health treatment. This is a claim against defendant Kallas in his official capacity for injunctive relief. To show that he is entitled to injunctive relief on this claim, Turner needs to prove that a policy or custom of the state played a part in the alleged constitutional deprivation. *Kentucky v. Graham*, 473 U.S. 159, 166 (1985)). Turner faces a high burden on this claim: this court is limited to ordering injunctive relief that "is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right." *See* 18 U.S.C. § 3626(a)(1)(A).

The parties have submitted evidence showing that the PSU continues to have vacancies and that for at least some of the time discussed in this opinion—particularly a gap from April 2017 to February 2019—Turner failed to receive follow-up care at least in part because of a long wait list. But Turner's treatment has improved since then, including him seeing psychiatric nurse practitioner Field several times since 2021, with Field ready to see Turner every few months. And Turner continues to be able to meet with PSU staff during rounds and by request.

The fact that Turner no longer faces long treatment delays because of staffing shortages does not automatically mean that his claim for injunctive relief is moot, but there must be "some cognizable danger of recurrent violation, something more than the mere possibility." *Nelson v. Miller*, 570 F.3d 868, 882 (7th Cir. 2009) (internal quotations omitted). The parties haven't submitted any evidence suggesting that there is a real risk of Turner's wait times growing substantially, particularly given that WSPF's psychiatry staffing hours have been

17

increased by 33 percent. And there is no reasonable, limited action that I need to order DOC officials to take at this point. So I will grant defendants' motion for summary judgment on the official-capacity claim.

## CONCLUSION

I am granting summary judgment to defendants on most of Turner's claims. The only claim left for trial is his Eighth Amendment claim against defendant Mink for failing to follow up with him for months on his reports of depression and anxiety. I will direct the clerk of court to set a scheduling conference with Magistrate Judge Stephen Crocker to set the trial date and associated pretrial-submission deadlines regarding that claim.

Turner has already filed a motion in limine, Dkt. 123, along with proposed jury instructions and an exhibit list. Those filings are premature but I will not strike them from the record. If Turner seeks to revise any of those documents before his deadline to submit pretrial submissions, he must file a brand-new version of the document that completely replaces what he has already filed.

Turner has filed a motion "allowing all parties to pursue an alternative resolution by mediation." Dkt. 122. This court generally does not issue formal orders referring a case for mediation, so I will deny the motion as unnecessary. But the parties are encouraged to contact the clerk's office to request that Magistrate Judge Andrew Wiseman conduct a mediation. More information about court-sponsored mediation in this district is available at the court's website: https://www.wiwd.uscourts.gov/mediation.

ORDER

IT IS ORDERED that:

1. Plaintiff Glenn Turner's motion for extension of time to submit his summary judgment opposition materials, Dkt. 109, is GRANTED.

2. Defendants' motion for extension of time to file their summary judgment reply, Dkt. 117, is GRANTED.

3. Defendants' motion for summary judgment, Dkt. 91, is GRANTED in part as reflected in the opinion above.

4. The clerk of court is directed to set a scheduling conference with Magistrate Judge Stephen Crocker.

5. Plaintiff's motion for mediation, Dkt. 122, is DENIED as unnecessary.

Entered August 2, 2023.

BY THE COURT:

/s/

_____
JAMES D. PETERSON
District Judge